HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| IRON PARTNERS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> MARITIME ADMINISTRATION, UNITED STATE DEPARTMENT OF TRANSPORTATION; KAISER VENTURES, LLC; KSC RECOVERY, INC.; KAISER STEEL CORPORATION; and KAISER COMPANY, INC. <br><br> Defendants. | Case No. 3:08-CV-05217-RBL <br><br> ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT <br> [Dkt. #89] |

## I. INTRODUCTION

THIS MATTER comes before the Court upon Plaintiff Iron Partners' Motion for Partial Summary Judgment against Kaiser only. [Dkt. #89]. Iron Partners seeks a ruling as a matter of law that: Kaiser is liable under Washington's Model Toxics Control Act (MTCA); that the cleanup of the Property was the substantial equivalent of an Ecology-conducted cleanup; and that Kaiser is therefore liable to Iron Partners for the entire cost of that cleanup.

While it effectively concedes the first point (as it must), Kaiser argues that Iron Partners' cleanup was far more expensive than an Ecology-conducted or -supervised cleanup would have

ORDER - 1

been, and that it was done for business reasons. It denies that it is liable for that cost, much less that it can be so found on Summary Judgment.

For the reasons that follow, Iron Partners' Motion is DENIED.

## II.  BACKGROUND

This lawsuit concerns the investigation and environmental cleanup of the following three adjacent parcels of real property located in the Columbia Business Center in Vancouver, Washington: (1) Plaintiff's 2.75-acre parcel; (2) the 11.64-acre Marine Park and Boat Launch Facility owned by the City of Vancouver; and (3) a 3.13-acre parcel owned by L & L Land Company. In the 1940s, Defendant Kaiser Company owned the properties and buried a significant amount of waste accumulated from its shipbuilding operations. Plaintiff now seeks Kaiser's contribution under the Model Toxics Control Act for the remediation performed on its parcel.

### A.  Acquisition of the Iron Partners Parcel

Iron Partners, an Oregon general partnership (Iron Partners), purchased the property related to this dispute in December 1991. [Brandt-Erichsen Dec., Dkt. #104-6, at 13]. Defendant Kaiser's expert maintains that a 1991 Dames & Moore Site Assessment identified contamination of the property "consisting of copper, zinc, lead, and chromium in black sand on the surface of the property," but that Iron Partners never had the soil analyzed to determine the mobility of the contaminants as recommended in the assessment. [Jewett Dec., Dkt. #104, at 4-5]. A copy of this assessment is not included in the record.

In 2006, subsurface investigation of the parcel was performed by Brady Environmental, Inc. (BEI), which included background information about the property. [Hoffman Dec., Dkt. #90-1, at 4]. According to this report, Iron Partners did in fact contract with Dames & Moore to complete a Phase I environmental site assessment (ESA) because it had previously conducted a Phase I ESA on other properties within the Columbia Business Center. *Id.* Dames & Moore decided that a Phase II ESA would be necessary to address the environmental concerns on the property. *Id.* The report claims that the Phase II ESA led to the removal of an underground storage tank and associated contaminated soils located in the northern portion of the property. *Id.*

The Phase II ESA apparently did not discover the buried landfill that is the subject of this motion. *Id.* After the Phase II ESA was completed, Iron Partners purchased the property. *Id.*

Plaintiff Iron Partners, LLC acquired the property from Iron Partners in January 2007. [Brandt-Erichsen Dec., Dkt. #104-6, at 16]. Prior to this acquisition, the buried landfill had already been discovered, and the first soil samples were taken in June 2006.

### B. Discovery of the Buried Debris

In Spring 2005, Iron Partners discovered buried debris on the southern portion of its property during an excavation project to install new footings for a crane rail system. In June 2006, Plaintiff hired BEI as a consultant to determine when the waste had been dumped and whether any of the surrounding soil posed a threat to human health or the environment. [Hoffman Dec., Dkt. #90-1]. During BEI's first subsurface investigation, it determined that the debris dated back to the 1940s, that contaminants were present in the soil, and that the landfill likely spilled over onto adjacent properties.[1] [*Id.* at 6]. The report also recommended that Iron Partners not use the bridge crane over the buried debris area. *Id.*

Iron Partners began investigating previous owners of the property to determine who dumped the waste in order to provide all potentially liable parties with notice of the contamination. It discovered that during World War II, Defendant Kaiser used the property to build U.S. Navy and merchant ships pursuant to a contract with the United States Maritime Administration. BEI investigated the property on two more occasions and determined that the buried debris located on the southern portion of Iron Partners' property was approximately 8,500 tons. [Hoffman Dec., Dkt. #90-10, at 4]. Subsequent investigations continued to indicate that soils were contaminated above levels established by the MTCA and therefore would likely require remedial action. [Hoffman Dec., Dkt. #90-4, #90-10]. BEI never took any groundwater samples to confirm whether the contaminants were migrating or leaching. *Id.*

---

[1] Kaiser alleges in its response that Iron Partners also "accepted the recommendation of its consultant, who told them that he could find a way to have others pay for removing the non-structural fill and restoring full use of the crane through pursuit of contribution claims under the CERCLA and MTCA." [Def. Resp., Dkt. #104, at 2].

ORDER - 3

In January 2007, Iron Partners notified Kaiser, the United States, and the Washington Department of Ecology (Ecology) of the contamination. [Hoffman Dec., Dkt. #90-2, at 2]. The buried debris extended towards the south, encroaching on the Marina Park and Boat Launch Facility owned by the City of Vancouver and extended towards the east, encroaching on L & L Land Company's parcel. [Hoffman Dec., Dkt. #91, at 14]. But the operational area of Kaiser's WWII dump and its incinerator had been located on Iron Partners' property. [Hoffman Dec., Dkt. #92-1, at 11]. Ultimately, 8,312 square feet of the City's 11.64 acre property and 18,932 square feet of Iron Partners' 2.75 acre property were deemed a "dangerous waste area." [Hoffman Dec., Dkt. #91, at 21].

In April 2008, Iron Partners filed a complaint against Kaiser and the United States. It continued to discuss potential remedial actions with the other parties. In Fall 2008, BEI dug additional soil test pits at Kaiser's request and a third-party environmental consultant and archaeologist representing Kaiser were present. [Hoffman Dec., Dkt. #90-10, at 3]. The soil samples of this subsurface investigation confirmed that groundwater had not yet been impacted by the buried debris, but the report also concluded that groundwater was "believed to be close to the bottom of the buried landfill" and that monitoring wells would likely be a necessary condition. *Id.* The archaeologist confirmed that the debris was from the 1940s, and he recommended that the buried landfill be preserved as a historic archaeological site. [Hoffman Dec., Dkt. #90-20, at 14].

Eventually, both Iron Partners and the City entered Ecology's voluntary cleanup program. Through the Fall of 2009, the parties continued to discuss the most appropriate remedial action with cost-sharing plans proposed and rejected. Iron Partners suggested the construction of a concrete environmental cap, installation of monitoring wells, and two years of groundwater monitoring. [Hoffman Dec., Dkt. #90-14, at 2]. Iron Partners also asked for either an indemnity agreement or an insurance policy paid by Kaiser to cover the uncertainty of potential groundwater contamination. *Id.* Kaiser rejected this proposal. *Id.*

In November 2009, the City of Vancouver hired a consultant, Pacific Groundwater Group, Inc. (PGG), to complete a site-wide remedial investigation, feasibility study, and

1  disproportionate cost analysis (RI/FS/DCA) on all three properties. The samples PGG took
2  confirmed the presence of hazardous substances in the debris, including lead, cadmium, and
3  petroleum hydrocarbons. [Hoffman Dec., Dkt. #91, at 14]. The nature and extent of the soil
4  contamination indicated that "much of the debris exceed[ed] soil cleanup levels." [*Id.* at 20].
5  PGG's groundwater monitoring showed no signs of contamination downgradient from the Site,
6  and it found no indication that the hazardous substances were leaching into groundwater. [*Id.* at
7  22]. PGG concluded that because the debris had been buried since the 1940s, "site conditions are
8  not expected to change and cause leaching or transport of contaminants from the debris." [*Id.* at
9  23]. However, PGG never installed monitoring wells on or near the portion of the property that it
10 designated as a dangerous waste area. [*See id.* at 21].

11     In the RI/FS/DCA, PGG selected three remedies to analyze that could be implemented so
12 that the properties would be protective of human health and environment: (1) No action; (2)
13 Contain the waste and implement institutional controls, including long-term monitoring and a
14 restrictive covenant; and (3) Excavation of the debris and contaminated soils, off-site disposal of
15 contaminated soils, and clean backfill. PGG quickly dismissed the first alternative, stating that it
16 "is unlikely to achieve the goal of protecting human health and the environment." *Id.* Alternative
17 2 (Containment and Controls) and Alternative 3 (Excavation, Off-Site Disposal, and Backfill)
18 were both considered viable alternatives. [*Id.* at 27]. Although Alternative 3 achieved the highest
19 benefit score by providing for both immediate and long-term protection, PGG found Alternative
20 2 to be the Site's preferred remedy based on its disproportionate cost analysis. [*Id.* at 28].
21 According to PGG's analysis, both Alternative 2 and 3 received similar benefits scores, but the
22 cost of implementing excavation and off-site disposal would exceed $3.7 million. *Id.*
23 Containment and control, on the other hand, had an estimated cost of $137,800. *Id.*

24     Iron Partners apparently wished to avoid implementing a remedial action that would
25 burden its property with a restrictive covenant prohibiting, among other things, "drilling,
26 digging, placement of any objects or use of equipment which deforms or stresses the surface
27 beyond its load bearing capability, piercing the surface with a rod, spike, or similar item,
28 bulldozing, or earthwork." [Hoffman Dec., Dkt. #92-4, at 4]. Iron Partners alleges that it used its

property for fabrication and storage, and included a permanently installed bridge crane, and that the containment and control alternative would have been significantly burdensome on its future business operations. Thus, it commissioned BEI to began a supplemental analysis of other alternatives that PGG did not consider, including partial excavation, waste segregation, or waste stabilization. BEI was concerned that PGG's analysis underestimated the cost of Alternative 2 and overestimated the cost of Alternative 3, and BEI believed that there was another cost-effective alternative that would be more protective than simply containing and controlling the waste on site. [Hoffman Dec., Dkt. #9-21, at 3-5]. Kaiser alleges (and supports with evidence) that Iron Partners intended to do a more thorough cleanup for business reasons, and asked BEI to justify that choice after PPG suggested that Alternative 2 was more efficient.

      BEI concluded that the most cost-effective remedial action was to segregate and stabilize the waste on site, which reduced the cost of off-site disposal because the uncontaminated soil was placed back into the excavation area as backfill. This alternative would also allow Iron Partners to preserve some of the waste for archaeological preservation. Kaiser rejected this proposal in late 2009. [Hoffman Dec., Dkt. #91-6, at 4]. Nevertheless, Iron Partners sought Ecology's approval for the plan, which was granted in February 2010. Shortly after, BEI began the remedial excavation. Since then, Ecology has issued a No Further Action letter to Iron Partners.[2] The cost of BEI's remediation action was $784,545, which included the excavation of unexpected gasoline-soaked soil. Nevertheless, the costs proved to be less than the $3.7 million estimated by PGG.[3]

      Iron Partners now moves for partial summary judgment against Kaiser, seeking a finding that (1) Kaiser is liable under the MTCA; (2) its remedial action was the substantial equivalent of an Ecology-conducted or -supervised cleanup; and (3) Kaiser is liable for all of its remediation

---

[2] Ecology has also issued a No Further Action determination with respect to the Containment and Control remedy implemented on the City's parcel.

[3] It is not clear whether PGG's estimate of the Containment and Control remedy on the City's parcel proved to be accurate.

ORDER - 6

costs and reasonable attorney fees. Kaiser does not dispute that it is a liable party under the MTCA.[4]

### III.  DISCUSSION

**A.  Standard of Review**

Summary judgment is appropriate when the record shows that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *U.S. v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990). When a properly supported motion for summary judgment is made, the burden then shifts, and the opposing party must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. Put another way, summary judgment should be granted when the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. *Id.* at 252. When viewing the evidence at this stage, all justifiable inferences are drawn in favor of the nonmoving party. *Id.* at 255.

**B.  Liability under the Model Toxics Control Act (MTCA) is strict, joint, and several.**

MTCA recognizes that every person has a "fundamental and inalienable right" to a healthy environment. RCW 70.105D.010. MTCA also acknowledges the public's interest "to efficiently use our finite land base, to integrate our land use planning policies with our cleanup policies, and to clean up and reuse contaminated industrial properties in order to minimize industrial development pressures on undeveloped land and to make clean land available for future social use." RCW 70.105D.010(4). In order to effectuate these purposes, MTCA imposes strict, joint, and several liability for "all remedial action costs" on current and past owners and operators of the facility at the time of either the release or disposal of hazardous substances. RCW 70.105D.040(2).

A private right of action to recover the costs of a remediation from a potentially liable

---

[4] A party is strictly liable under the MTCA if it is (1) the owner or operator of the facility; (2) the owner or operator of the facility at the time of disposal or release of hazardous substances, (3) any person who facilitated the disposal of hazardous substances, or (4) any person who transported hazardous substances to the facility. RCW 70.105D.040(1). Accordingly, both Kaiser and Iron Partners are liable parties under the MTCA.

ORDER - 7

party is allowable if the remedial action is the substantial equivalent of an Ecology-conducted or -supervised cleanup.[5] RCW 70.105D.080. The court shall base the amount of recovery on equitable factors that it deems appropriate, and the prevailing party shall recover reasonable attorneys' fees and costs. *Id.* To determine whether a remediation is the substantial equivalent of an Ecology-supervised cleanup, the court should evaluate the MTCA guidelines as a whole. WAC 173-340-454(1). A claim should "not be disallowed due to omissions that do not diminish the overall effectiveness of the remedial action." *Id.*

**C. Iron Partners seeks judgment as a matter of law that its "Alternative 3" cleanup was the substantial equivalent of an Ecology-conducted or -supervised cleanup.**

Iron Partners claims that it is entitled to full recovery costs from Kaiser for the excavation, segregation, and disposal of the hazardous soils located on its parcel because this remedial action was the substantial equivalent of an Ecology-conducted or -supervised cleanup. Ecology has promulgated a series of regulations to assist the courts in making such a determination.

1. <u>Guidelines for Courts in Evaluating Whether an Independent Remediation is the Substantial Equivalent to an Ecology-supervised or -conducted cleanup</u>

Ecology considers any independent remedial action that includes the following elements to be the substantial equivalent of a department-conducted or -supervised clean up: (1) Information on the site and the conducted remedial action were properly reported to Ecology; (2) Ecology has not objected to the remediation being conducted; (3) Advance public notice was provided; (4) The remediation was conducted substantially equivalent with Ecology's technical standards and evaluation criteria; and (5) Where facilities have disposed of hazardous waste as part of the remedial action, proper documentation has been provided to Ecology. WAC 173-340-545(2)(c). However, the Washington Court of Appeals has held that these elements are merely guidelines to assist private parties rather than absolute requirements. *Taliesen Corp. v. Razore*

---

[5] "Remedial action means any action or expenditure consistent with the purposes of this chapter to identify, eliminate, or minimize any threat or potential threat posed by hazardous substances to human health or the environment including any investigative and monitoring activities with respect to any release or threatened release of a hazardous substance…" RCW 70.105D.020(26).

ORDER - 8

*Land Co.*, 135 Wn. App. 106, 120 (2006). Instead, courts should look at the "overall effectiveness" of the remediation to determine whether it was the substantial equivalent of an Ecology-supervised cleanup. *Id.*

In this case, Iron Partners reported the contamination to Ecology soon after its discovery and submitted a report to the department once the remediation was completed. [Hoffman Dec., Dkt. #90-2, at 2]. BEI discussed Iron Partners' selected cleanup with Ecology prior to its implementation. [Hoffman Dec., Dkt. #91-7]. The department approved the plan and, once the remediation was completed, issued a No Further Action determination for Iron Partners' parcel. [Hoffman Dec., Dkt. #90-3]. Iron Partners gave notice to all potentially liable parties three years before commencing the remediation, and it also complied with the public notice requirements established by Ecology. [See, e.g., Hoffman Dec., Dkt. #91-5]. Finally, Iron Partners properly notified the department of the location of the disposed hazardous waste. [Hoffman Dec., Dkt. #92-1].

Kaiser argues that Iron Partners did not comply with the technical standards and evaluation criteria as set forth in the regulations. In particular, it claims that because the containment and control remedy would have met the substantial equivalent standard, then any costs that went "beyond the scope of that remedy are not 'necessary' response costs recoverable under RCW 70.105D.080." [Def. Resp., Dkt. #104, at 16].

Kaiser's position relies on the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Kaiser argues that a more expensive yet more permanent remedial action cannot be considered the substantial equivalent (particularly not on summary judgment) because it was not necessary to protect human health or the environment.  . Although CERCLA requires the response costs to be 'necessary" to address the threat to human health or the environment, this language is absent from MTCA.

2. <u>MTCA does not expressly require that the chosen method of cleanup be "necessary" to protect the environment or human health.</u>

When evaluating compliance with the technical standards and evaluation criteria to determine substantial equivalence, "it should be recognized that there are often many alternative

ORDER - 9

methods for cleanup of a facility that would comply with [the] provisions" set forth in the MTCA regulations. Kaiser argues that notwithstanding compliance with MTCA regulations, the remediation costs must still be necessary to qualify as the substantial equivalent of an Ecology-conducted cleanup. It argues, persuasively, that "[t]he notion that response costs must be 'necessary' in order to be recoverable is more precisely articulated under CERCLA, but no less applicable under MTCA." [Def. Resp. Dkt. #104, at 16].

MTCA was modeled after CERCLA, and in many sections, the language was copied exactly. Where similar language is used, federal cases interpreting CERCLA may be used as persuasive authority when interpreting the MTCA. In this case, CERCLA states that recovery is limited to "necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A)(B). MTCA drafters did not include this language in the state statute. Iron Partners asks the Court to presume that the language was deliberately omitted. Although CERCLA also requires the remediation be cost-effective, 42 U.S.C. § 9621(a), there is no such requirement under the MTCA.

Instead, the MTCA specifies only the minimum requirements for a remediation, which do not include any language that might suggest only the necessary costs for the least expensive cleanup may be recovered. Under the MTCA, the selected cleanup action shall (1) protect the environment and human health; (2) comply with cleanup standards; (3) comply with applicable state and federal laws; and (4) provide compliance monitoring. WAC 173-340-360(2)(a). When selecting from among remedial alternatives that all meet these threshold requirements, "the selected action shall use permanent solutions to the maximum extent practicable." WAC 173-340-360(2)(b)(i). Iron Partners points out that, during public comment for the 2001 amendments to the MTCA, Ecology explained that "[i]n addition to meeting each of the minimum requirements specified in WAC 173-340-360, cleanup actions shall not rely primarily on institutional controls and monitoring where it is technically possible to implement a more permanent cleanup action for all or a portion of the site." [Moore Dec., Dkt. #106-1, at 2-3].

Iron Partners selected a cost-effective, permanent remedial action that excavated, segregated, and disposed of contaminated soils located on its property. It received a No Further

Action decision from the Department of Ecology, which stated that the remediation was protective of human health and the environment and that it complemented the City's less permanent containment and control remedy. [Hoffman Dec., Dkt. #92-3, at 5]. Iron Partners complied with all applicable regulations even though omissions on its part would still have allowed a claim under the MTCA as long as "the overall effectiveness of the remedial action" was not diminished. *See* WAC 173-340-545(1); *Talisen*, 135 Wn. App. at 120.

From this, Iron Partners asks the court to find and conclude as a matter of law that, because these minimum requirements were met, Iron Partners' remediation was the substantial equivalent of an Ecology-conducted or -supervised cleanup as a matter of law.

Kaiser argues that under MTCA, a party's recovery "shall be based on such equitable factors as the court determines are appropriate." [Citing RCW 70.105D.080.] Recovery of remedial action costs shall be limited to those remedial actions that, when evaluated as a whole, are the substantial equivalent of a department-conducted or department-supervised remedial action. Substantial equivalence shall be determined by the court with reference to the rules adopted by the department under this chapter. *Id.*

Kaiser is correct. Iron Partners claims that MTCA permits full recovery, without regard to the economic efficiency or ecological necessity of the cleanup. This position finds no legal or logical support in the authorities it cites, and is not good policy. This is particularly true where, as here, there is evidence that Iron Partners chose the cleanup it did for business reasons.

For these reasons, the court cannot rule as a matter of law that the Iron Partners' clean up was the substantial equivalent of an Ecology – conducted or – supervised cleanup, and that Kaiser is required to pay the full cost of it. The Motion for Summary Judgment is DENIED.

    3.  <u>A cleanup undertaken for business reasons is not subject to full contribution.</u>

Kaiser argues that *Talisen* stands for the proposition that liable parties may not be asked to pay for another liable party's past business decisions. There, the court determined that Talisen's remediation was the substantial equivalent of an Ecology-conducted cleanup because it had removed all soils that had any detectable levels of contamination. *Talisen*, 135 Wn. App. at

122. The cleanup was protective of human health and the environment even though it was not cost-effective, and because of the cleanup's overall effectiveness, the court held that it met the standard of substantial equivalence. *Id.* Nevertheless, the court limited Talisen's recovery and allocated almost half of the allowable costs of cleanup to the prevailing party. *Id.* at 140.

Though the facts of *Talisen* were more egregious than those alleged by Kaiser here, there is, at the very least, a question of fact as to whether Iron Partners remediated its property to a higher standard than an equivalent Ecology – conducted or –supervised cleanup for business reasons. For this reason as well, the Plaintiff's Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**

Dated this 28th day of September, 2011.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE